No. 44,591

PETER W. GIDDINGS and VIRGINIA GIDDINGS; ARTHUR M. SCOTT and CHRISTINE A. SCOTT; WILLIAM T. BRAUN and MARION BRAUN; MAREA B. BLACK; BENJAMIN B. HINMAN and MARY HINMAN; HAROLD H. SPENCER, *Appellees,* v. THE CITY OF PITTSBURG, KANSAS, *Appellant.*

(421 P. 2d 181)

Opinion filed December 10, 1966.

*Charles H. Menghini,* of Pittsburg, argued the cause and was on the brief for the appellant.

*J. John Marshall,* of Pittsburg, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

FONTRON, J.: This appeal is from a judgment enjoining the City of Pittsburg, Kansas, from proceeding with certain street improvements.

The essential facts are not seriously disputed. Catalpa Street runs north and south in Pittsburg and, for the present, is surfaced with asphalt. On October 28, 1963, a petition was filed with the city clerk of Pittsburg requesting that Catalpa Street, from Quincy to Maple Streets, be improved with concrete pavement, including curb, storm sewer, inlets and all appurtenances. This petition designated the area which the signers proposed should be assessed to pay for the improvement and was signed by the owners of record of more than one-half of the proposed assessment area.

A hearing was held before the city commission on November 12, 1963, at which time the plaintiffs, who are interested landowners, made their appearance and voiced their objections. Subsequently, and on December 10, 1963, the commission found the petition to be sufficient and made findings as to the advisability and nature of the improvement, the estimated cost, the boundaries of the improvement district, the method of assessment and the apportionment of costs between the city at large and the improvement district.

This lawsuit was thereafter filed by the plaintiffs. On February 3, 1964, after what appears to have been an extensive hearing, the district court issued a permanent injunction, and from this judgment the defendant has appealed. In the course of this opinion, the appellees will be referred to as plaintiffs, and the appellant as the city, or defendant.

In this appeal, the city contends that the trial court erred in two particulars: First, in concluding that the improvement district was unauthorized by law, and second, in concluding that the findings

of the governing body of the city relating to the petition were arbitrary and unreasonable.

Before the contentions of the respective parties can fully be grasped, the extent and boundaries of the area subject to assessment must be known. For this reason, we have appended to this opinion a copy of the proposed improvement or benefit district to which the reader may refer. As may readily be seen from a glance at the plat, the benefit or improvement district comprises all the lots which abut on Catalpa Street, both on the east and on the west, plus one additional lot to the east (Lot 10, Messenger Place), which the record shows is owned in common with Lot 11.

Although the lots lying on both sides of Catalpa Street (plus Lot 10) are included in the improvement or benefit district, only the owners of the lots which lie on the west side of the street have signed the improvement petition. The owners of lots on the east side either refused to sign or were not approached and, so far as we can tell, all of these owners are joined as plaintiffs in this lawsuit.

The combined area of the lots on the west side of Catalpa, all of whose owners signed the petition, constitutes more than one-half the total area of the proposed district (being slightly more than 57%), while the lots lying east of Catalpa comprise less than half of the district's entire area (just less than 43%).

With these facts in mind, we turn to the statute under which the improvement petition was initiated and pursuant to which the city commission took its action. K. S. A. 12-6a04 provides, so far as pertinent to this case, that where a petition for an improvement sets forth the general nature of the improvement, the estimated or probable cost thereof, the extent of the proposed improvement district, the proposed method of assessment, the proposed apportionment of cost between city and district and a request that the improvement be made without notice, such petition may be filed with the city clerk, and may be found sufficient if signed by the owners of record of more than one-half of the area liable to be assessed under the proposal.

The statute then provides that upon the filing of such a petition, the governing body may make findings by resolution as to the advisability and nature of the improvement, the estimated cost, the boundaries of the improvement district, the method of assessment and apportionment of cost, if any, between the improvement district and the city at large, and thereupon the governing body may proceed without notice and hearing to order the improvement, and

that no protest shall be received. A final proviso, which is not involved in this action, prohibits any enlargement of the improvement district area set forth in the petition unless notice is given and a hearing is held.

A principal ground upon which the plaintiffs attack the sufficiency of the instant petition is that it was not signed by the record owners of a majority of the area which, they say, the law requires be made liable for assessment to pay for the proposed improvements. In other words, the plaintiffs insist that the improvement district fixed by the city commission does not meet the requirements set by law and that if a legally sufficient district were to be established, the petition would lack enough signers.

To support this contention, the plaintiffs argue here, as we assume they did before the trial court, that under Kansas law a benefit district must extend to the middle of the block on each side of the street; that the petition did not set out a benefit district which extended to the middle of each block and, accordingly, was not signed by the owners of a majority of the area in a legally constituted district; and hence, that the city's action in approving the petition and in establishing an improvement district in accordance therewith was unauthorized by law and the district so created was invalid and a nullity.

This line of reasoning was accepted by the trial court. In a letter addressed to counsel outlining the reasons for its decision, the court said that the district did not conform to the requirements of the case law on the subject in that it did not extend to the midpoint of the block on each side of the street. In its journal entry, the trial court found that the resolution authorizing the improvement was unreasonable and arbitrary in omitting property which should have been included in the benefit district and that the action of the city was invalid in that the improvement district did not encompass a properly designated area.

We believe the trial court was in error in its conclusions. The improvement district described in the petition and defined by the city commission does, in our opinion, meet statutory requirements. It is true that K. S. A. 12-601 provides that the cost of street improvements shall be paid by and assessed to the property on each side of the street to the middle of the block. This statute has formed a part of the general paving law of this state for many years and its provisions have been employed countless times in the levying of special assessments to pay for street improvements. How-

ever, in recent years the application of 12-601, *supra*, has become increasingly difficult in view of the disposition of modern city planners to disregard the grid system in laying out streets and to rely, instead, on a system of curves, arcs, circles and squiggles.

In 1957, the Kansas legislature, recognizing the practical problems involved in determining what constitutes a "block" within the meaning of K. S. A. 12-601 in those areas which are platted with artistic design, and realizing the inequities which may result from application of the "center-of-the-block" assessment method, enacted legislation (now K. S. A. 12-6a01-17) embodying new procedures for the construction of street improvements and the assessment of benefits therefor. This Act (Ch. 99, L. 1957) was intended to provide a complete alternative to other methods of determining benefits and levying special assessments to pay for improvements, as the explicit language of K. S. A. 12-6a02 clearly shows. (See, also, article by Albert B. Martin, "Survey of Kansas Law: Municipal Corporations," 8 Kan. L. Rev. 317, 323.)

Under the provisions of the 1957 Act, the property which is liable for assessment to pay the cost of street improvements is not that which extends to the middle of the block on each side of the street (which formerly we knew as a "benefit district"), but property which lies within an "improvement district," a term which is defined by K. S. A. 12-6a01 (*f*) as follows:

" 'Improvement district' means an area deemed by the governing body to be benefited by an improvement and subject to special assessment for all or a portion of the cost of the improvement."

When the governing body of a city defines the boundaries of an improvement district, as above defined, the area contained therein becomes the area against which special assessments are to be levied and against which the sufficiency of the petition is to be measured. Under the terms of 12-6a04, *supra*, if the petition be signed by owners of over one-half the property located in such an improvement district, as was true in the present case, then the petition is sufficient to initiate an improvement project without notice and regardless of protest.

The trial court's conclusion that resort must be had to K. S. A. 12-601 to discover the meaning of an "improvement district" is erroneous since the definition thereof is contained in the Act itself [K. S. A. 12-6a01 (*f*)]. It is the area which the governing body deems will be benefited by the improvement, and thus subject to

special assessment for all or part of the cost. In commenting on the extent of the improvement district to be assessed, the author of the pamphlet published by The League of Kansas Municipalities, "General Improvement & Assessment Law for Kansas Cities" (1957), states on page 4:

". . . The legislature, recognizing the impossibility of prescribing a rigid formula applicable in all cases for determining the benefit conferred by public improvements has provided the general formula, which city governing bodies must apply to the specific facts and local conditions and at their discretion, within the framework of the act, determine the specific property benefiting and liable for assessment for a particular improvement."

At this point, we take note of the trial court's reference to our recent decision in *Terrill v. City of Lawrence,* 193 Kan. 229, 392 P. 2d 909, in which we looked to K. S. A. 12-601 for assistance in determining what was meant by a street which had not been "improved," or which was an "unimproved street" within the meaning of K. S. A. 12-6a06. We sought this means of assistance because the term "improved street" was nowhere defined in the 1957 Act. We do not have an analogous situation before us in this case, for the 1957 Act does define what an "improvement district" shall be. Consequently, the *Terrill* case furnishes no precedent to support the conclusion reached by the trial court.

The plaintiffs have maintained throughout this lawsuit that the city acted arbitrarily and with bad faith in defining the improvement district. The trial court's finding in this regard was that "the resolution authorizing the improvements was arbitrary and unreasonable in omitting property which should have been included in the benefit district." When considered in the light of the trial court's letter to counsel setting out the basis for its decision, coupled with the conclusion of law inserted in the journal entry to the effect that the city's action "was invalid in that the *improvement district did not encompass a properly designated area,*" we believe the finding of unreasonableness was induced by the court's misconception of what the law requires an improvement district to include. Hence, we are not inclined to view the court's finding of arbitrary and unreasonable action as one of general bad faith on the part of the city commission; rather, we believe it indicative only of the city's failure to include within the improvement district the property on each side of Catalpa Street to the middle of the block, as the court concluded was required by law.

Regardless, however, of how we may view the trial court's finding in such regard, we are fully aware of the duty which rests upon members of the governing body of a city to act fairly and in good faith when fixing the boundaries of an improvement district under the provisions of 12-6a04, *supra*. In other words, the members of a city commission may not abuse the discretion with which they are clothed in determining the area which will be benefited by an improvement. On the other hand, it is a general principle of law that courts do not enjoin the action taken by a city government except in a clear case of an abuse of discretion. (*Engstrom v. City of Wichita*, 121 Kan. 122, 245 Pac. 1033.) In 14 McQuillin, Municipal Corporations, 3rd Ed., § 38.55, p. 171, we find the rule precisely stated:

"In the establishment of improvement districts and levying assessments on property therein benefited, within the restrictions of the applicable law, broad discretion is vested in the municipal authorities, and their determination will not be reviewed in the absence of fraud or arbitrary action."

We see nothing in the record which can be said to resemble caprice or bad faith on the part of the Pittsburg city fathers. The assessments, as proposed in the petition and as found by the city commission, are to be based on area. As shown by the map set out in the appendix, every lot which adjoins Catalpa Street—the street to be improved—is included in the improvement district. As lots abutting on Catalpa, it may be assumed they will receive benefits from the improvement common to each other but different in kind, or degree, from lots which do not front on that street. Only one non-abutting lots is included in the district, and that lot is commonly owned with one facing Catalpa.

The plaintiffs intimate that the district was gerrymandered to ensure that the lots on the west side of Catalpa comprised more than 50% of the district's entire area. A glance at the map reveals no gross eccentricities in the district profile. Particular complaint is leveled against the exclusion of Lots 19 and 20, Messenger Place. These two lots face on Maple Street, not Catalpa, and are separately owned from Lot 18, which does adjoin Catalpa and is included in the district. Thus, it would appear there was valid reason for omitting Lots 19 and 20 from the proposed assessment district. It may hardly be said these two lots would benefit to the same extent as lots abutting on Catalpa Street.

A further point is made that Lot 9, Messenger Place, was omitted, even though it was commonly owned with Lots 10 and 11, and with

the latter lots comprised a single building site. Although we believe this lot might logically have been included in the district, as was Lot 10, we do not consider its omission as evidence of bad faith. Had Lot 9 been included, the east boundary line of the district would have been even more irregular than it now appears. Moreover, the inclusion of Lot 9, either singly, or in combination with Lots 19 and 20, would not have changed the ownership balance— the area of the lots bordering Catalpa on the west even then would have amounted to more than 50% of the entire assessment area.

The record contains testimony by an August Rua, who owns Lot 10 on the west side of Catalpa, that he signed the petition because he thought the majority of owners wanted the street improved. There is also evidence that Mr. Rua stated to others that he felt the improvement would enhance the value of his property. The trial court found no fraud or fault in the securing of Mr. Rua's signature, nor do we think the evidence would have justified any such finding.

Plaintiffs also question the city's action on the ground that drainage facilities were included in the improvement project and, on oral argument, insinuated that the storm sewer would be located at the rear of the lots lying on the west side of Catalpa Street. We think there is no merit in the contention. K. S. A. 12-6a03 specifically permits the joinder of two or more types of improvements in, on or adjacent to the same street in one proceeding. It is clear from the petition itself that the storm sewer and inlets are to be on or beneath Catalpa Street, itself.

We find nothing in the record in this case to justify a finding that the city acted arbitrarily or capriciously, or to warrant us in substituting our judgment for that of its governing body.

Finally, the plaintiffs suggest that K. S. A. 12-6a01, *et seq.*, contravene the provisions of the 14th Amendment in depriving owners of their property without due process of law and that these statutes are otherwise invalid by failing to establish uniform standards for their application.

The plaintiffs have not favored us, either in their briefs or upon oral argument, with any citations whatever to support the point first suggested and we are, therefore, not disposed to belabor it in depth. We would observe, however, that K. S. A. 12-6a09 provides for a hearing, after the assessments have been determined, at which either written or oral objections will be considered, and that notice of the hearing shall be published and mailed to owners of property

affected. K. S. A. 12-6a11 limits the time for filing suit to set aside the assessments, or otherwise question the validity of the proceedings, to thirty (30) days after publication of the assessment ordinance. We should also emphasize that a meeting was actually held on November 12, 1963, nearly thirty (30) days before the city commission acted on the petition, at which time all the owners on the east side of Catalpa who could "get out of bed" appeared to enter their objections.

Although the plaintiffs have alleged that notice of the November meeting was not given all property owners, this was denied by the defendant, and there is no evidence in the record to sustain the plaintiffs' position in this regard.

We believe that the provisions for notice, and for bringing legal action to test the validity of the city's action, appear quite adequate to enable property owners to be heard and to present their grievances. (*Newson v. City of Wichita*, 186 Kan. 444, 351 P. 2d 10.)

The second suggestion of invalidity, we believe, is likewise untenable. The plaintiffs do not argue that the 1957 Act contains an unlawful delegation of legislative power, nor would such an argument have merit. The legislature may enact a general law conferring administrative duties upon an officer or a board to apply its provisions and, for the purpose of accomplishing that end, to determine the existence or non-existence of a fact or condition requisite to the law's application. (*Hill v. Johnson County*, 82 Kan. 813, 109 Pac. 163; *The State, ex rel., v. Raub*, 106 Kan. 196, 186 Pac. 989; *State, ex rel., v. Fadely*, 180 Kan. 652, 308 P. 2d 537; 16 C. J. S. Constitutional Law, § 141, pp. 676-680.) In *Newson v. City of Wichita*, supra, we said:

"The rule of apportionment among the parcels of land benefited . . . rests within the discretion of the legislature. It may direct the assessment to be in proportion to the position, the frontage, the area or the market value of the lands, or in proportion to the benefits determined by commissioners. . . ." (p. 450.)

However, a legislative enactment which confides certain fact-finding functions to a suitable agency must prescribe reasonably clear standards by which that agency must be guided in determining the facts which give rise to the law's operation (*State, ex rel., v. Fadely*, supra). This is the area in which the plaintiffs maintain the 1957 Act is deficient. We do not agree.

Whenever a petition containing certain required information is filed with the city clerk, pursuant to K. S. A. 12-6a04, the governing body of a city may find it to be sufficient if signed by the record owners of more than one-half the area liable to be assessed, and the governing body may then determine the boundaries of the improvement district and the method of assessment to be employed. The criterion, of course, is whether the area to be assessed, and hence to be included in the improvement district, will be benefited by the improvement. Such is the standard by which the sufficiency of the petition is to be gauged and the improvement district established. It is true that the determination of whether the area will be benefited demands the use of judgment on the part of the governing body. It is true, also, that such judgment may not be exercised arbitrarily. Nonetheless, a city is not given *carte blanche* to approve *any* petition for street improvements or to establish *any* improvement district to pay therefor. The standards for doing so are set by law and must be followed.

For reasons heretofore indicated, we conclude that the judgment of the lower court must be reversed and this case remanded with instructions to enter judgment in favor of the defendant.

It is so ordered.

APPENDIX